## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JAMES SPRINGER,

      **Plaintiff,**

vs.                                      **No. 1:23-cv-00781-KWR-LF**

MICHELLE LUJAN GRISHAM,
OFFICE OF THE GOVERNOR,
PATRICK ALLEN, and
NM DEPARTMENT OF HEALTH,

      **Defendants.**

## DEFENDANTS' RESPONSE TO PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY INJUNCTION UNDER THE GOVERNOR'S MOST RECENT ORDERS

Defendants Governor Michelle Lujan Grisham, Secretary Patrick M. Allen, and the New Mexico Department of Health (collectively, "Defendants"),[1] by and through their counsel of record, hereby submit their Response to Plaintiff's Renewed Motion for Preliminary Injunction Under the Governor's Most Recent Orders (the "Motion") [Doc 10].

### Introduction and Background

Having only recently emerged from a global pandemic, New Mexico finds itself in the midst of another public health crisis. In 2021, the last year for which complete data is available from the Centers for Disease Control and Prevention, New Mexico's gun death rate was the third highest in the nation.[2] In a single twelve-month period, firearm related emergency room visits

---

[1] The Office of the Governor, named in the caption of Plaintiffs' complaint, is not a legal entity that can sue or be sued.

[2] *See Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico*, at 5, N.M. Dep't of Health (Sept. 28, 2023), https://www.nmhealth.org/publication/view/report/8462/.

increased 77% for males aged 0-13, 115% for females aged 14-17, and 32% for males aged 14-17. *See id.* Since 2017, firearm death rates have increased by 91% for American Indian/Alaska Native residents, 78% for Hispanic residents, and 47% overall. *Id.* Staggeringly, New Mexico's firearm injury death rate is 90% higher than the national average. *Id.*

One need look no further than local news coverage to witness the tragic effects of this crisis. On September 6, 11-year-old Froylan Villegas, along with his mother, baby brother, and cousin were returning home from an evening at the Isotopes game when seventeen bullets tore through their car.[3] At least one of those bullets struck Froylan, killing him; another seriously injured his cousin. *See id.* Unfortunately, this is only one example of how gun violence is destroying the lives of New Mexicans, including children.[4]

Governor Michelle Lujan Grisham has made significant efforts to address gun violence during her term in office, including championing public health and safety legislation, convening task forces, and increasing funding for public safety.[5] But the terrible events described above

---

[3] Alexa Skonieski, *Family, friends grieve 11-year-old shot, killed while leaving Isotopes Park*, KRQE News (Sept. 12, 2023), https://www.krqe.com/news/albuquerque-metro/family-friends-remember-11-year-old-shot-killed-while-leaving-isotopes-park/.

[4] *See, e.g.*, Aliza Chasan, *14-year-old boy, dad arrested after teen allegedly used father's gun to kill teenage girl in New Mexico*, CBS News (July 30, 2023), https://www.cbsnews.com/news/teen-father-arrested-girl-shot-killed-gun-police-assault-questa-new-mexico/; *APD charges 4 teens for drive-by shooting that killed 5-year-old girl*, KOB News (Aug. 21, 2023), https://www.kob.com/new-mexico/apd-charges-4-teens-for-drive-by-shooting-that-killed-5-year-old-girl/; Jessica Salinas, *Albuquerque mom accused of shooting 7-year-old accused in other abuse cases*, KRQE News (Sept. 22, 2023), https://www.krqe.com/news/albuquerque-metro/albuquerque-mom-accused-of-shooting-7-year-old-accused-in-other-abuse-cases/.

[5] *See, e.g.*, Press Release, *Governor delivers over $40 million for new police officers across New Mexico*, Office of Gov. Michelle Lujan Grisham (Sept. 9, 2022), https://www.governor.state.nm.us/2022/09/09/governor-delivers-over-40-million-for-new-police-officers-across-new-mexico/; Press Release, *Gov. Lujan Grisham priority legislation effective today*, Office of Gov. Michelle Lujan Grisham (June 16, 2023), https://www.governor.state.nm.us/2023/06/16/gov-lujan-grisham-priority-legislation-effective-today/; Press Release, *Governor establishes ERPO task force*, Office of Gov. Michelle Lujan

deprived the Governor of luxury of time to wait and see these efforts yield results. And so the Governor took more immediate action and issued Executive Orders 2023-130 and 2023-132 invoking her powers under the All Hazard Emergency Management Act (AHEMA), NMSA 1978, §§ 12-10-1 to -10 (2007), and declaring a state of public health emergency due to gun violence and drug abuse pursuant to the Public Health Emergency Response Act (PHERA), NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015).[6]

Shortly thereafter, Department of Health Secretary Patrick Allen issued a public health emergency order imposing broad restrictions on the possession of firearms in cities and counties with high levels of gun violence and implementing various other measures meant to reduce gun violence and drug abuse (the "PHO").[7] Plaintiff and numerous individuals and groups filed federal lawsuits seeking preliminary and permanent injunctive relief to bar enforcement of the PHO, primarily arguing it infringed upon their Second Amendment rights. *See Nat'l Ass'n for Gun Rights v. Lujan Grisham*, 2023 WL 5951940 (D.N.M. Sept. 13, 2023); [Doc. 1]. These cases were all initially assigned to the Honorable David H. Urias. *See id.*; Order on "Expedited Motion" to Recuse [Doc. 7]. However, Judge Urias recused himself from presiding over this case at Plaintiff's request. *See id.*

---

Grisham (Aug. 26, 2022), https://www.governor.state.nm.us/2022/08/26/governor-establishes-erpo-task-force/.

[6] *Executive Order 2023-130*, Gov. Michelle Lujan Grisham (Sept. 7, 2023), https://www. governor.state.nm.us/wp-content/uploads/2023/09/Executive-Order-2023-130-1.pdf;   *Executive Order 2023-132*, Gov. Michelle Lujan Grisham (Sept. 8, 2023), https://www.governor.state.nm. us/wp-content/uploads/2023/09/Executive-Order-2023-132.pdf.

[7] *Public Health Order*, N.M. Dep't of Health (Sept. 8, 2023), https://cv.nmhealth.org/wp-content/uploads/2023/09/090823-PHO-guns-and-drug-abuse.pdf.

On September 13, 2023, Judge Urias granted the other plaintiffs' requests for a temporary restraining order enjoining the Governor and Secretary Allen from enforcing the PHO "to the extent it imposes additional restrictions on the carrying or possession of firearms that were not already in place prior to its issuance." *Nat'l Ass'n for Gun Rights*, 2023 WL 5951940 at *5. Two days later, Secretary Allen amended the PHO to, *inter alia*, remove the broad prohibition on the carrying of firearms in Albuquerque and Bernalillo County and replace it with a narrow provision restricting firearms in public parks, playgrounds, and "other public areas provided for children to play in."[8] On October 5, 2023, the Governor renewed the states of public health emergency pursuant to Section 12-10A-5(D)(2).[9] The following day, Secretary Allen amended the PHO to, among other things, clarify the scope of its firearm restrictions and remove the restriction of firearms in "other public areas provided for children to play in."[10]

The PHO's narrowed restrictions on firearms were again immediately challenged in federal court as violating the Second Amendment. *See We the Patriots, Inc. v. Lujan Grisham*, 2023 WL 6622042 (D.N.M. Oct. 11, 2023). On October 11, 2023, Judge Urias issued a memorandum opinion and order denying a preliminary injunction against the October 6 PHO's restrictions on

---

[8] *Public Health Order*, N.M. Dep't of Health (Sept. 15, 2023), https://cv.nmhealth.org/wp-content/uploads/2023/09/NMAC-EO-2023-130-132-Amended.pdf.

[9] *Executive Order 2023-135*, Gov. Michelle Lujan Grisham (Oct. 5, 2023), https://www.governor.state.nm.us/wp-content/uploads/2023/10/Executive-Order-2023-135.pdf; *Executive Order 2023-136*, Gov. Michelle Lujan Grisham (Oct. 5, 2023), https://www.governor.state.nm.us/wp-content/uploads/2023/10/Executive-Order-2023-136.pdf. The Governor most recently renewed the state of public health emergency on November 3, 2023. Although the most recent executive orders have not yet been posted online due to technical issues, they will be posted on the following website next week: https://www.governor.state.nm.us/about-the-governor/executive-orders/.

[10] *Public Health Order*, N.M. Dep't of Health (Oct. 6, 2023), https://cv.nmhealth.org/wp-content/uploads/2023/10/NMAC-PHO-20231006-Amended.pdf.

the possession of firearms in public parks and playgrounds. *See We the Patriots*, 2023 WL 6622042, at *1. With regard to parks, Judge Urias found it "plausible" that the temporary restrictions were consistent with the Nation's historical tradition of firearm regulation given the existence of similar laws in numerous cities and three states from the time period before and following the ratification of the Fourteenth Amendment. *Id.* at **8-9. And with regard to playgrounds, Judge Urias found these spaces analogous to schools, which the United States Supreme Court had recognized were "sensitive places" in which firearms could constitutionally be prohibited. *See id.* at **9-11. Accordingly, Judge Urias held that the plaintiffs failed to meet their burden to demonstrate their challenge to the PHO's temporary restrictions was likely to succeed. *Id.* at *9.

On October 16, 2023, this Court denied Plaintiff's request for an *ex parte* temporary restraining order regarding the original PHO's broad restrictions on the possession of firearms because the restrictions were no longer in effect and Plaintiff had not established facts showing that he had standing to challenge the restrictions on firearms in parks and playgrounds. [Doc. 9 at 1, 4] The Court further observed that Plaintiff had not demonstrated a likelihood of success on the merits as to the operative PHO because "he has not engaged with the historical tradition analysis under *Bruen* by showing that the regulation restricting firearms in playgrounds and certain public parks is inconsistent with the Nation's historical tradition of firearm regulation." [Doc. 9 at 5] Plaintiff subsequently filed the Motion, seeking a preliminary injunction against the PHO's current restrictions on firearms in parks and playgrounds.

The Court should deny the Motion. At the outset, Plaintiff lacks standing to challenge the PHO because he does not specifically allege or assert that he intends to carry firearms in parks or playgrounds going forward, and the City of Albuquerque already prohibits such conduct. Plaintiff

also fails to demonstrate a substantial likelihood of success on the merits of any challenge to the PHO. Multiple courts have already indicated that the government may constitutionally prohibit firearms in playgrounds, which are analogous to sensitive locations such as schools that the Supreme Court recognizes are excepted from the Second Amendment's commands. The same goes for the temporary restriction on firearms in parks given the tradition of comparable historical regulations. And Plaintiff's First Amendment undeveloped viewpoint discrimination challenge fails for a multitude of reasons. Lastly, Plaintiff cannot demonstrate any form of harm, let alone irreparable harm, stemming from the PHO.

## Argument & Authorities

### I.    Plaintiff fails to demonstrate standing to enjoin the PHO's restrictions on parks and playgrounds

Plaintiffs in federal civil actions must demonstrate standing for each form of relief sought. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Id.* at 560-61, 112 S.Ct. 2130 (citations omitted). To demonstrate injury-in-fact in the context of a future or prospective prosecution, a plaintiff must establish "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Given the unique requirements imposed by *Bruen* that the Court analyze Second Amendment restrictions as to certain and specific places, plaintiffs must establish standing as to each such "place" where regulations apply. *Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland*, 2023 WL 4373260, *5 (D. Md. July 6, 2023); *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 257 (N.D.N.Y. 2022),

*reconsideration denied sub nom. Antonyuk v. Nigrelli*, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022); *Koons v. Platkin*, 2023 WL 3478604 (D.N.J. May 16, 2023).

As the Court has noted, neither Plaintiff's complaint nor his initial motion for a temporary restraining order contained sufficient allegations showing that he has standing to challenge the PHO's restrictions on parks and playgrounds in Bernalillo County. [Doc. 9] Plaintiff has now attached an updated declaration to the Motion stating:

> I have been prohibited by the [PHO] from lawfully carrying my firearm . . . for most of the months of September and October at the parks that I attend for non-scholastic youth sporting events or just to enjoy the beautiful fall weather in Albuquerque during the balloon fiesta.

[Doc. 10-2] Importantly, however, Plaintiff fails to assert that he intends to carry a firearm in these locations *going forward*—especially since he lives in an entirely different county. *See* [Doc. 1 ¶ 1] *Antonyuk*, 639 F. Supp. 3d 232, 262 (N.D.N.Y. 2022) (finding a lack of standing for plaintiffs that have previously visited locations in which firearms are prohibited when they did not allege that they intend to visit those locations in the future); *Maryland Shall Issue*, 2023 WL 4373260, at *5 (finding a lack of standing when the plaintiffs did not allege they intended to visit the locations in question with a firearm). Furthermore, Plaintiff fails to allege or assert that he has or will continue to carry firearms in playgrounds. *See generally* Motion; [Doc. 10-2].

Additionally, the City of Albuquerque has issued administrative instructions interpreting New Mexico statutes that prohibit the carrying of deadly weapons (including firearms) on school premises[11] to apply to city neighborhood parks, city sports fields, city pools and their parking lots, Balloon Fiesta Park, and Civic Plaza, along with other enumerated City properties such as

---

[11] *See* NMSA 1978, § 30-7-2.1 (1994); NMSA 1978, § 30-7-2.4 (2003).

community centers, health and social service centers, and senior centers.[12] Thus, enjoining Defendants from enforcing the PHO will not redress Plaintiff's purported injury. *See Valdez v. Lujan Grisham*, 2022 WL 2129071 (10th Cir. 2022) (noting that even if injunction were granted to prohibit enforcement of state vaccine mandate for hospital workers, the plaintiff was still required to be vaccinated under federal law, and thus her "injury . . . is not redressable by enjoining the PHO"). Accordingly, the Court must deny Plaintiff's requested relief for failure to demonstrate standing.

## II.   Plaintiff cannot establish that he is entitled to a preliminary injunction

### A.   Standard of review

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (internal quotation marks and citation omitted). To obtain preliminary injunctive relief, plaintiffs must show that "(1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits." *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992). "The third and fourth factors 'merge' when, like here, the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). Because preliminary injunctive relief is an "extraordinary remedy, . . . the right to relief

---

[12] *See AI No. 5-19*, City of Albuquerque (Aug. 16, 2019), https://export.amlegal.com/media/8ffbf7 b40c28f5c233e2316a4dae2a820825b80f/DATAOBJECTS/0-0-0-1765.pdf; *AI No. 5-20*, City of Albuquerque (Aug. 31, 2020), https://export.amlegal.com/media/8ffbf7b40c28f5c233e2316a4dae 2a820825b80f/DATAOBJECTS/0-0-0-1978.pdf. Plaintiff should be aware of this, as his attorney is currently challenging this measure in state court. *See New Mexico Patriots Advocacy Coalition v. Keller*, Case No. D-202-CV-2020-01048 (2nd Jud. Dist. Ct.).

must be clear and unequivocal." *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006). The movant *must* satisfy his or her burden for *each* one of these prerequisites. *See Diné Citizens Against Ruining Our Env't*, 839 F.3d 1276, 1281-82 (10th Cir. 2016).

Further, "[b]ecause the limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," the Tenth Circuit specifically disfavors "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. Univ. of Colorado et.al.*, 427 F.3d 1252, 1258-59 (10th Cir. 2005) (internal quotation marks and citation omitted). Therefore, "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms[.]" *O Centro Espirita Beneficente Uniao do Vegetal ("O Centro") v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).

Plaintiff's requested injunctive relief falls into the category of disfavored injunctions because it would require the Court alter the status quo and force Defendants to affirmatively alter the PHO and the State's enforcement of it. *Cf. ETP Rio Rancho Park, LLC v. Grisham*, 522 F. Supp. 3d 966, 1003, 1028 (D.N.M. 2021) (noting that the plaintiffs' request "to prohibit Defendants from enforcing all PHOs" required affirmative action and was therefore disfavored). Thus, this Court should closely scrutinize Plaintiffs' request for preliminary injunctive relief and require Plaintiffs to "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms[.]" *O Centro*, 389 F.3d at 975.

**B.      Plaintiff cannot demonstrate a strong likelihood of success on the merits**

1.      The PHO is constitutional under *Bruen*

Even if Plaintiff could establish standing to challenge the PHO, he cannot demonstrate that he is likely to succeed in challenging the PHO's restrictions on firearms in parks and playgrounds. In *Bruen*, the United States Supreme Court adopted a new two-part test for Second Amendment claims, in which courts would first ask "whether the Second Amendment's plain text covers an individuals' conduct" and, if so, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. This inquiry considers whether there is "historical precedent" from before, during, and after the enactment of the Second and Fourteenth Amendments that "evinces a comparable tradition of regulation" in a similar manner as the present-day restriction. *Id.* at 2131, 2137-38.

For many modern-day firearm regulations, this analysis will require "reasoning by analogy." *Id.* at 2130, 2132. Two primary metrics are relevant for determining whether a modern regulation is "relevantly similar" to a historical regulation: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'central'" considerations when engaging in an analogical inquiry." *Id.* at 2133. But the Court has made it "clear" that analogical reasoning under the Second Amendment is not "a regulatory straightjacket" and "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* (internal quotation marks and citations omitted)). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

One category of laws the Supreme Court identified that courts could examine to determine whether modern regulations prohibiting the carry of firearms are constitutionally permissible is "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* (quoting *D.C. v. Heller*, 554 U.S. 570, 626 (2008)). While there were "relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited," the Court was not aware of any disputes regarding the lawfulness of such prohibitions, and therefore "assume[d] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 2133. Thus, "courts can use analogies to [these] historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.*

Here, the PHO's restriction on carrying firearms in playgrounds is constitutionally permissible because they are analogous to schools—a location which the Supreme Court has specifically deemed to be a "sensitive place" where carrying firearms could be prohibited consistent with the Second Amendment. *See id*. As Judge Urias and other district courts have held, "playgrounds are often associated with schools and therefore the inference that they are sensitive places under *Bruen* is appropriate." *We the Patriots*, 2023 WL 6622042, at *10 (citing *Siegel v. Platkin*, 2023 WL 1103676, at *10 (D.N.J. Jan. 30, 2023)). This is because both locations typically contain a "vulnerable population" that are unable to defend themselves or exercise Second Amendment rights of their own (i.e., children). *See id.*; *see also Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 324 (N.D.N.Y. 2022) (finding that ban on firearms in playgrounds "finds support in those historical analogues prohibiting firearms in schools given that, by their very nature, both places often contain children"), *reconsideration denied sub nom. Antonyuk v. Nigrelli*, 2022 WL

19001454 (N.D.N.Y. Dec. 13, 2022); *Maryland Shall Issue*, 2023 WL 4373260, at *9 (finding childcare facilities analogous to schools because and noting that "prohibitions on firearms in both schools and childcare facilities are meant to protect the same or similar vulnerable populations, consisting of students and children"); *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010) (noting that "[t]he [Supreme] Court listed schools and government buildings as examples[ of sensitive places], presumably because possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children)"). Accordingly, the PHO's provisions banning firearms possession in playgrounds is constitutional.

The Court should reach the same conclusion with regard to the PHO's restriction of firearms in parks. In *Mayland Shall Issue*, the court addressed this very issue. In determining whether there was a history of restricting firearm possession and carrying in public parks, the court identified dozens of state and local regulations restricting the possession or carry of firearms in public parks or their historical analogues, including firearm bans in parks in the five largest cities in the United States. *Id.* at *11. The court explained: "As to public parks, numerous historical statutes and ordinances from the time period before and following the ratification of the Fourteenth Amendment imposed such restrictions in relation to parks." *Id.* The court identified examples of prohibiting gun carrying in parks in Central Park in New York City and Fairmount Park in Philadelphia, Pennsylvania; as well as parks in Detroit, Michigan; Chicago, Illinois; Saint Paul, Minnesota; Williamsport, Phoenixville, and Reading, Pennsylvania; Boulder, Colorado; Wilmington, Delaware; Trenton, New Jersey; Oakland, California; Staunton, Virginia; and Birmingham, Alabama. *Id.* The court also identified similar statewide laws in Minnesota, Wisconsin, and North Carolina. *Id.* Ultimately, the court concluded, "[t]hese laws which. . . categorically bar the carrying of firearms in parks, demonstrate that there is 'historical precedent'

from before, during, and after the ratification of the Fourteenth Amendment that 'evinces a comparable tradition of regulation' of firearms in parks." *Id.* (quoting *Bruen*, 142 S. Ct. at 2131-32).

In addition to the laws cited by the court in *Mayland Shall Issue*, Defendants point out that New Mexico itself had a law making it "unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any settlements of this Territory" unless they were threatened with imminent danger of an attack on themselves, family or property, 1869 Terr. of N.M. Laws ch. 32, § 1, Arizona prohibited "the carrying of firearms in any 'place where persons are assembled for amusement or for educational or scientific purposes,'" and Oklahoma prohibited firearms in any place "where persons are assembled . . . for amusement, or for educational or scientific purposes." *Antonyuk*, 639 F. Supp. 3d at 323.[13] Texas similarly prohibited firearms in numerous public venues and social gatherings. *See* 1871 Texas Gen. Laws ch. 34, § 1.[14] And Missouri enacted a law in 1883 "prohibiting the carrying of firearms in places where people are assembled for 'educational, literary or social purposes' and 'any other public assemblage of persons met for any lawful purpose.'" *Antonyuk*, 639 F. Supp. 3d at 323. These

---

[13] Although *Bruen* discounted the impact of territorial restrictions on firearms, subsequent research and legal analysis has suggested that because territories were subjected to the Second Amendment well before the Fourteenth Amendment made it applicable to the states, this approach may have been short-sighted. *See Atkinson v. Garland*, 70 F.4th 1018, 1036 (7th Cir. 2023); Andrew Willinger, *The Territories Under Text, History and Tradition*, 101 Wash. U. L. Rev. 1, 13-21 (2023).

[14] The Supreme Court of Texas upheld the law, finding arguments to the contrary "little short of ridiculous." *English v. State*, 35 Tex. 473, 476 (1871). While the Court in *Bruen* declined to rely on this Texas law and the reasoning in *English* because it "'contradict[ed] the overwhelming weight of other evidence regarding the right to keep and bear arms for defense' in public[,]" 142 S. Ct. at 2153 (quoting *Heller*, 554 U.S. at 632), the Court did not speak to its persuasive value in determining whether there is a historical tradition of prohibiting firearms in certain locations such as parks.

broader territorial and state laws buttress the conclusion that a narrower restriction on firearms in parks in New Mexico's most-populated city and county is supported by the historical record.

Significantly, this Court's colleague, Judge Urias, reached the same conclusion as the court in *Mayland Shall Issue* in upholding the PHO's prohibition of firearms in parks in Albuquerque and Bernalillo County. In so holding, Judge Urias recognized that two other district courts reached an opposite conclusion. *See We the Patriots*, 2023 WL 6622042, at **7-8 (citing *Antonyuk*, 639 F. Supp. 3d 232, and *Koons*, 2023 WL 3478604).[15] However, Judge Urias observed, the *Antonyuk* court discounted the myriad local ordinances—which it found arguably "support a historical tradition of banning firearms in public parks in a city (where the population density is generally higher)"—because it was examining a law prohibiting firearms in parks throughout the state (unlike the PHO here). *Antonyuk*, 639 F. Supp. 3d at 325; *see We the Patriots*, 2023 WL 6622042, at *8. And while the *Koons* court acknowledged there were "many laws—mostly local ordinances—from the 19th and 20th centuries restricting firearms at parks," the court ignored many of the laws it deemed too far removed from 1868 and found the remaining laws insufficient

---

[15] Although Judge Urias did not discuss it, he was also aware that a district court in Hawaii rejected the Maryland district court's conclusion simply because some of the laws were enacted after the ratification of the 14th Amendment. *See Wolford v. Lopez*, 2023 WL 5043805, at *23 (D. Haw. Aug. 8, 2023). But *Bruen* does not require courts to ignore laws passed after 1868—especially when they were passed shortly after that time and do not contradict earlier evidence. *See* 142 S. Ct. at 2154 & n.28; *accord Vincent v. Garland*, 80 F.4th 1197, 1203 (10th Cir. 2023) (stating that the court will consider "the interpretation of the Second Amendment from its ratification *through the end of the nineteenth century*" (emphasis added)); *Antonyuk*, 639 F. Supp. 3d at 255 n.4 (recognizing that laws from the "decades" immediately before and after 1791 and 1868 are probative because they "are the approximate periods in which there lived the state and federal legislators who ratified the Second and Fourteenth Amendments by a three-fourths majority as well as the people who chose those legislators, and thus the laws from those time periods tend to shed more light on the public understanding of the plain meaning of the words 'keep and bear arms' in 1791 and 1868"). The Hawaii district court's opinion also suffered from the same flaws discussed below with regard to *Antonyuk* and *Koons*.

simply because "they governed less than 10% of the nation's entire population." *Koons*, 2023 WL 3478604, at **82-85).[16] But this refusal to consider many of these laws and the overly simplistic conclusion based on population alone finds little to no support in *Bruen*.[17]

Ultimately, Judge Urias concluded, "[w]hen all of the laws and ordinances cited by *Antonyuk*, *Koons*, and *Maryland Shall Issue* are combined and tallied, it appears plausible, although not certain, that Defendants may be able to demonstrate a national historical tradition of firearm restrictions at public parks within cities." *We the Patriots*, 2023 WL 6622042, at *9. Thus, the plaintiffs failed to demonstrate that their right to a preliminary injunction was "clear and unequivocal." *Id.* (quoting *Diné Citizens*, 839 F.3d at 1281).

Respectfully, the Court should reach the same conclusion as Judge Urias given the extraordinary standard that applies to preliminary injunctions. Moreover, another district court judge has reached the same conclusion as the one in *Maryland Shall Issue*. *See Kipke v. Moore*, 2023 WL 6381503, at **9-10 (D. Md. Sept. 29, 2023). On the other hand, the *Antonyuk* and *Koons* decisions have been stayed pending appeal—indicating that the Second and Third Circuits disagree with their conclusions. *See Antonyuk v. Hochul*, 2022 WL 18228317, at *1 (2d Cir. Dec. 7, 2022)

---

[16] The *Koons* court also erroneously discounted these laws because there were no colonial era laws prohibiting firearms in parks. *See* 2023 WL 3478604, at **82-84. This is historically incorrect, as "parks around 1791 were not comparable to modern parks." *Wolford*, 2023 WL 5043805, at *21. There were no modern-style parks at the time of the Founding Era. "Parks" such as Boston Common, were used primarily as a pasture, a place for public executions, and a site for the militia to muster and drill. *See* Steven R. Pendery, *Probing the Boston Common*, 43 Archaeology 42-47 (1990); Suzanne Scheld *et al.*, *Rethinking Urban Parks: Public Space and Cultural Diversity*, 19-20 (2009); Michael Rawson, *Eden On The Charles: The Making Of Boston*, 73 (2014). Notably, in Colonial Massachusetts, militia members were prohibited from coming to muster with a loaded firearm. *See Records of The Governor and Company Of The Massachusetts Bay In New England*, 98 (1853); 1866 Mass. Acts 197, An Act Concerning the Militia, § 120.

[17] *See supra* note 15; Andrew Willinger, *Litigation Update: Antonyuk Round 3; Judge Grants Preliminary Injunction of Large Portions of New York's Post-Bruen Law*, Duke Ctr. For Firearms L. (Nov. 18, 2022), https://firearmslaw.duke.edu/2022/11/litigation-update-antonyuk-round-3-judge-grants-preliminary-injunction-of-large-portions-of-new-yorks-post-bruen-law/.

(granting stay of preliminary injunction after having "weighed the applicable factors" (citing *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007); Order, *Koons v. Att'y Gen. of N.J.*, No. 2023-CV-16164 (3d Cir. June 20, 2023) (granting stay of preliminary injunction against restriction on firearms in parks "because the applicable factors warrant such a stay" (citing *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015)). Simply put, the current post-*Bruen* case law strongly suggests Plaintiff will not ultimately prevail on the merits of his Second Amendment challenge.

Plaintiff gives this Court no reason to conclude otherwise. Plaintiff relies exclusively on a pre-*Bruen* Idaho district court opinion holding that an Army Corps. of Engineers regulation prohibiting firearms at dams and the surrounding recreation areas violated the Second Amendment simply because it "banned" firearms rather than "regulating" them. *See Morris v. U.S. Army Corps of Engineers*, 60 F. Supp. 3d 1120, 1123 (D. Idaho 2014); Motion at 5. However, this regulation did not address the same sort of "parks" in urban areas that are covered by the PHO. Moreover, the then-binding Ninth Circuit precedent that the district court relied on for this conclusion was subsequently vacated and replaced with a significantly different en banc opinion. *See GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1325 n.5 (11th Cir. 2015) (declining to rely on *Morris* and noting this fact); *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 921 (9th Cir. 2016) (en banc). And finally, the *Morris* court did not engage in *Bruen*'s historical analysis (which does not revolve on whether a law completely "bans" or simply "regulates" firearms), so its holding has no application here.

2.     The PHO does not violate the First Amendment

Plaintiff next argues that the PHO somehow violates his First Amendment rights. *See* Motion at 6-7. However, Plaintiff does not try to explain exactly how this is so. *See id.* To the

extent Plaintiff ties this argument to his desire to attend protests in Civic Plaza, *see* Motion at 3, this is a moot point because the PHO no longer covers this forum. Regardless, many courts have held that "gun possession alone is unlikely to convey a particular message that would be understood by those who witnessed it" and is therefore not protected by the First Amendment. *Chesney v. City of Jackson*, 171 F. Supp. 3d 605, 617 (E.D. Mich. 2016) (collecting cases). Thus, the Court should reject Plaintiff's First Amendment claim given his failure to explain how the First Amendment applies to his conduct going forward. *See Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct.").

Assuming, *arguendo*, Plaintiff *could* show that the First Amendment applies to gun possession in certain instances, such as attending a pro-gun rally, Plaintiff's facial challenge to the PHO's prohibition of firearms in parks and playgrounds in all instances fails because the vast majority of its application does not chill any speech. *See Rio Grande Found. v. City of Santa Fe*, 437 F. Supp. 3d 1051, 1074 (D.N.M. 2020). Nor can Plaintiff show how the PHO's prohibition on firearms in parks and playgrounds constitutes viewpoint discrimination (the only First Amendment basis Plaintiff presents in his complaint) as applied to pro-gun rallies because the prohibition applies equally to firearms at anti-gun demonstrations (e.g., burning or destroying guns) in those locations and there is no evidence that Defendants enacted the restrictions *because of* Plaintiff's speech. *See Pahls v. Thomas*, 718 F.3d 1210, 1230-31 (10th Cir. 2013) ("[F]or plaintiffs to prevail as to each defendant, they must show that the defendant's individual actions caused viewpoint discrimination to occur, and that those actions were taken because of, not merely in spite of, plaintiffs' anti-Bush message." (alterations, internal quotation marks. and citation omitted); *United States v. Durango & Silverton Narrow Gauge R.R. Co.*, 2020 WL 9432882, at *1 (D. Colo. July

14, 2020) (stating that "a motion for preliminary injunctive relief presupposes a claim to which that request is tethered").[18]

In short, Plaintiff has failed to demonstrate he is likely to succeed on the merits of his First Amendment claim. Because Plaintiff cannot establish that he is likely to succeed in challenging the PHO's provisions on any constitutional basis, the Motion must be denied. *See Diné Citizens*, 839 F.3d at 1281-82.

### C.   Plaintiff cannot demonstrate any harm, much less *irreparable* harm

The Court should also deny the Motion for failure to establish an injury, let alone an *irreparable* one. As discussed earlier, the City of Albuquerque already prohibits Plaintiff from carrying a firearm in parks and playgrounds. *See* discussion *supra* Section I. Thus, Plaintiff cannot demonstrate that he will be injured *at all* by enforcement of the PHO. And even if the City of Albuquerque did not already prohibit firearms in parks and playgrounds, Plaintiff cannot demonstrate any *irreparable* harm. Plaintiff's "harm" of not being able to protect his family while at parks and playgrounds without his gun depends on unsupported speculation that they will be attacked while at those locations. This is insufficient. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) ("To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." (internal quotation marks and citation omitted)). And Plaintiff's failure to demonstrate a substantial likelihood of success on the merits of his claims means he cannot demonstrate irreparable harm based on the purported loss of his constitutional rights. *See Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016) ("[A] plaintiff who cannot

---

[18] Even if this as-applied claim *did* have merit, Plaintiff does not have standing to enjoin the PHO as applied to pro-gun rallies or protests because he has not asserted that he has concrete plans on attending rallies at a park covered by the PHO. *See generally* Motion; *Antonyuk*, 639 F. Supp. 3d at 289 (rejecting standing because the plaintiff "does not assert a concrete intention to attend a 'pro-gun' rally armed in the immediate future").

demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." (citing *Schrier*, 427 F.3d at 1266)). Therefore, the Motion must be denied. *See Diné Citizens*, 839 F.3d at 1281-82.

## Conclusion

For the foregoing reasons, the Court should deny Plaintiff's request for a preliminary injunction.

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor Michelle Lujan Grisham*
**KYLE P. DUFFY**
*Deputy General Counsel to Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
Holly.Agajanian@exec.nm.gov
Kyle.duffy@exec.nm.gov

SERPE ANDREWS, PLLC

*/s/ Cody R. Rogers*
Cody R. Rogers
2540 El Paseo Road, Suite D
Las Cruces, NM 88001
(575) 288-1453
crogers@jarmielaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 9, 2023, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

<u>*/s/ Cody R. Rogers*</u>
Holly Agajanian